# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| Tyson Blue, on behalf of himself and all others similarly situated, | : | Case No. 3:24-CV-00836 |
| | : | (Hon. Jack Zouhary) |
| Plaintiff, | : | |
| vs. | : | **DEFENDANT INOAC EXTERIOR SYSTEMS, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR COURT-SUPERVISED NOTICE TO POTENTIAL OPT-IN PLAINTIFFS, TOLLING, AND EXPEDITED DISCOVERY** |
| INOAC Exterior Systems, LLC, | : | |
| Defendant. | : | |
| | : | |

Defendant INOAC Exterior Systems, LLC ("INOAC" or the "Company"), by and through undersigned counsel, opposes Plaintiff Tyson Blue's ("Plaintiff") *Motion for Court-Supervised Notice to Potential Opt-In Plaintiffs, Tolling, and Expedited Discovery* ("Motion"). (ECF # 18). As addressed in greater detail below, Plaintiff's Motion should be denied, and he must pursue his claims against INOAC individually.

## I.   INTRODUCTION

Plaintiff alleges a violation of the FLSA's overtime provisions by failing to pay employees for work allegedly performed before and after their scheduled start and stop times. (Compl. ¶¶ 21-24.) Plaintiff seeks a sweeping order authorizing notice of the lawsuit to be sent to all former and current non-exempt hourly manufacturing/production employees at INOAC's former facility in

8052019.1

Fremont, Ohio for the three years preceding the filing of the Complaint. (Motion p. 1.) The collective proposed by Plaintiff is improper for multiple reasons.

First, Plaintiff fails to offer evidence of a Company-wide FLSA violative policy. None of the testimony offered by Mr. Hardymon and cited in Plaintiff's Motion about general applicability of policies constitutes evidence of a single, FLSA-violative policy, as required by the Sixth Circuit. Further, Plaintiff offers no declarations, affidavits, or statements from any current or former employees to support his claim that he is similarly situated to all hourly manufacturing production employees. Instead, he relies exclusively on his own unsupported allegations, which are directly contradicted by INOAC's policies and other record evidence, including employee testimony that contradicts his assertions. (*See* Gibson Decl. and Jones Decl.) Plaintiff's vague and conclusory allegations that unidentified "others" were treated similarly, or that all employees were generally subject to the same overall timekeeping and payroll policies, fall well short of the Sixth Circuit's clarified standard in *Clark*, which requires a "strong likelihood" that the plaintiff and putative opt-ins are similarly situated. *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003 (6th Cir. 2023).

At best, Plaintiff's claims arise from his personal choices to allegedly deviate from INOAC policies and procedures, or engage in activities not required by the Company. This presents a quintessential individualized dispute, wholly unsuited for collective treatment. Under *Clark's* heightened standard, Plaintiff's unsupported, individualized claims fall far short of the showing required, and sending notice to employees who are not similarly situated would amount to improper solicitation, precisely the result the Supreme Court and Sixth Circuit have cautioned against.

## II. Relevant Background

### A. Company Background

INOAC operated a facility in Fremont Ohio, where it manufactured exterior automotive parts, specializing in mold and injection-molded plastic components such as winglets and spoilers, which were painted and finished for use by automotive manufacturers. (Hardymon Dep. 22-23.) The Company ceased production and closed its Fremont manufacturing operations in late spring 2025. (*Id.* p. 72-73.)

For most of Plaintiff's brief period of employment, the Fremont facility ran on three shifts, with each shift of production employees directly relieving the prior one. (*Id.* p. 20-21; Pl. Dep. 123.) Under this scheduling model, employees could not perform production work before or after their scheduled shift because the incoming shift immediately assumed production. (Hardymon Decl. ¶4.) The facility consisted of six manufacturing departments: General Assembly, Polishing, Paint, Sanding, Injection, and Blow Mold. (Hardymon Dep. 23; Hardymon Decl. ¶ 3.) Plaintiff worked in three positions, initially as a secondary operator in General Assembly, later as a polisher in Polishing, and finally as a loader/unloader on the paint line. (Pl. Dep. 21, 40.)

### B. Time Keeping Procedures

Before 2024, employees could clock in either through a mobile app once near the building or using manual clocks located just inside the doors leading to the production floor. (Hardymon Dep. 32, 41-42.) In 2024, the time clocks were relocated to the center of the production floor. (Hardymon Dep. 42-44.) The Company discourages employees from reporting to work and clocking in far in advance of their scheduled shift, but permits employees to clock in up to seven minutes before their shift is scheduled to begin. (*Id.* 36.) After clocking in, employees are permitted to, and often do, engage in personal activities before they begin working, such as putting

3

their lunch in the employee breakroom or socializing while waiting for the pre-shift meeting. (Hardymon Decl. ¶16.) The Company's timekeeping system rounds all clock-in and clock-out times to the nearest quarter hour, whether forward or backward, in 7-minute increments. (Hardymon Dep. 34; Hardymon Decl. ¶17.)

    C. **Policies and/or Procedures as it relates to PPE and Company Meetings**

The Company requires every employee and visitor to wear both eye and hearing protection at all times on the production floor. (Hardymon Dep. 45-46; Pl. Dep. Ex. I at INOAC-182, 118; Hardymon Decl. ¶ 5.) Safety glasses and ear plugs are available in a corridor between the employee entrance and the door entering the production area. (Hardymon Dep. 45; Gibson Decl. ¶4; Jones Decl. ¶5; Hardymon Decl. ¶4.) Some employees bring these items to and from work; Plaintiff testified that approximately half the time he brought his safety glasses from the prior shift. (Pl. Dep. 69, 75.) Plaintiff admits donning and doffing ear and eye protection takes only about thirty seconds. (Pl. Dep. 71.)

At the start of each shift, and after production employees have clocked in, some supervisors hold a pre-shift meeting to provide status updates on work orders and job assignments. (Hardymon Dep. 46-47; 83; Jones Decl. ¶7; see also, Pl. Dep. 148; Hardymon Decl. ¶6.) Following the meeting, employees retrieve and don any required or optional job specific personal protective equipment ("PPE") necessary for those assignments. (Hardymon Decl. ¶ 7; Jones Decl. ¶7.) Then, employees begin to work.

Each manufacturing department (and, more specifically, each job description within the six departments) has distinct required PPE which varies depending on the employee's daily tasks. (Hardymon Decl. ¶3; Hardymon Dep. 53, 58; Gibson Decl. ¶8; Jones Decl. ¶11.) The Company provided other PPE to be used at the option of the employees. For example:

4

- *General assembly, polishing,* and *Paint Line 5 loader/unloader*— the positions Plaintiff held— only required hearing protection, eye protection, and substantial footwear. However, there were optional gloves available to employees. (Pl. Del. Exs. D, J, K; Hardymon Decl. ¶9 at JSA 33.)

- *Paint line 5 prepper* required safety glasses, hearing protection, and substantial shoes; optional PPE includes plastic sleeves. (*Id.* at JSA 32.)

- *Paint Line 5 Air Blower* required safety glasses, hearing protection, and substantial shoes. (*Id.* at JSA 31.)

- *Blow Mold Operator* required eye and hearing protection, substantial shoes, Kevlar sleeves and gloves, heavy gloves; optional PPE includes face shield and bump cap. (*Id.* at JSA 3.)

- *Injection Leader* required eye and hearing protection, substantial shoes, Kevlar sleeves and gloves, fire-resistant sleeves, and face shield. (*Id.* at JSA 49.)

The Company stores PPE items throughout the production areas, with replacements available from vending machines located in the production area or at the front of the building. (Hardymon Dep. 45, 47; Jones Decl. ¶12.) Paint suits, in particular, are stored at the back of the facility near the paint line, making it neither feasible nor customary for employees to don them before clocking in. (Hardymon Dep. 49.)

Time spent receiving work orders, retrieving PPE, and donning PPE required for assigned duties is fully compensated. (Hardymon Decl. ¶8.) Company policy provides that any required or optional job-specific PPE for a given day's work is retrieved on the production floor during paid time, after employees have clocked in and attended the pre-shift meeting. (Hardymon Dep. 46-47; 75; Hardymon Decl. ¶¶ 7, 8; Jones Decl. ¶13; Gibson Decl. ¶6.) The Company has no policy, written or unwritten, requiring employees to don specific PPE before clocking in or before the pre-shift meeting. (Hardymon Decl. ¶8; Jones Decl. ¶13.)

At the end of their shift, employees are expected to clean up and remove any job-specific PPE while still on the clock. (Hardymon Decl. ¶10; Gibson Decl. ¶7.) Once those tasks are

5

complete and the employee is prepared to leave the production floor, they may then clock out. (Hardymon Decl. ¶10.) Although there are showers in the locker room, there is no policy requiring any employee to change clothes or shower after their shift. (Hardymon Decl. ¶11; Gibson Decl. ¶12; Jones Decl. ¶18.)

The Company also has no policy requiring employees to wear a specific uniform or Company-issued shirt. (Hardymon Dep. 54; Hardymon Decl. ¶12; Pl. Dep. Exs. G, H at INOAC 150 and I at INOAC 189; Gibson Decl. ¶10; Jones Decl. ¶17.) While fully enclosed shoes are required, there is no requirement to wear steel-toe boots. (Pl. Dep. Exs. I at INOAC 184; Hardymon Dep. 52-53; Hardymon Decl. ¶13.) Even if such a requirement existed, employees could change shirts and shoes at home. (Pl. Dep. 109.)

Finally, depending on production needs, the Company holds all-staff communication meetings. The Company compensates employees for these meetings. (Hardymon Dep. 80; Hardymon Decl. ¶14.) If a meeting requires early arrival, employees are instructed to clock in upon arrival; if it extends beyond the end of a shift, employees remain clocked in until the meeting concludes. (Hardymon Decl. ¶14.)

### III.  COURT FACILITATED NOTICE IS NOT APPROPRIATE IN THIS CASE.

#### A. Heightened Requirements and Legal Standard For Court Facilitated Notice

Under the applicable standard established in *Clark*, collective actions under 29 U.S.C. §216(b) are subject to a stringent requirement to present evidence demonstrating that other employees are similarly situated to the Named Plaintiff. Only if the Named Plaintiff clears that hurdle will the Court allow the Named Plaintiff to notify those employees of the litigation and their right to "opt in" to it. See *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1009 (6th Cir. 2023). To do this, a plaintiff seeking authority to issue a notice of a FLSA collective action

6

must show a "***strong likelihood***" that those employees are similarly situated to the plaintiff. *Clark*, 68 F.4th at 1007, 1011. The strong-likelihood standard "requires a showing ***greater*** than the one necessary to create a genuine issue of fact, but less than the one necessary to show a preponderance." *Id.* (emphasis added). A plaintiff only shows a strong likelihood of similarity when his evidence raises questions "so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 385 (6th Cir. 2023) (defining "strong likelihood of success on the merits" in the preliminary injunction context) (quotation and citation omitted).

In *Clark,* **the Sixth Circuit cautioned that courts should not therefore "facilitate notice upon merely a 'modest showing' or under a 'lenient standard of similarity**.'" *Id.* at 1010. (emphasis added.) Courts have, and frequently exercise, discretion to deny court-facilitated notice of a collective action. *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006) (citing *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 169 (1989)). For the reasons that follow, Plaintiff has failed to present sufficient evidence to satisfy the heightened burden of demonstrating a strong likelihood that he is similarly situated to the proposed putative class.

**B. Plaintiff is Not Similarly Situated to All Hourly Manufacturing/Production Employees**

Plaintiff "bear[s] the burden of demonstrating that the proposed class members are similarly situated to the lead plaintiff." *Arends v. Family Solutions of Ohio, Inc.*, No. 1:18cv2017 2019 WL 4417674, *5 (N.D. Ohio Sept. 16, 2019) (citing *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009)); *Myers v. Marietta Memorial Hospital,* 201 F.Supp.3d 884, 890 (S.D. Ohio 2016). While the FLSA does not define "similarly situated," the Sixth Circuit has provided guidance on the meaning of the term. Some non-exhaustive factors include: "1) the factual and employment settings of the individual plaintiffs; 2) the different defenses to which the

7

plaintiffs may be subject on an individual basis; and 3) the degree of fairness and procedural impact of certifying the action as a collective action." *Monroe v. FTS USA, LLC*, 815 F.3d 1000, 1009 (6th Cir. 2016) (internal citations omitted), reversed on other grounds by *FTS USA, LLC v. Monroe*, 196 L. Ed. 2d 471, 137 S. Ct. 590 (2016). Here, each of these factors weigh against a finding that Plaintiff similarly situated "all hourly manufacturing/production employees" at the Fremont facility.

        **1. <u>Notice is Inappropriate because There is No Common FLSA-Violating Policy</u>**

Courts will find named plaintiffs to be similarly situated to a putative class "when they suffer from a single FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all plaintiffs." *O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 585 (6th Cir. 2009), *abrogated on other grounds, Campbell-Ewald Co. v. Gomez,* 136 S. Ct. 663, 670 (2016) (emphasis added.)  However, as a threshold matter, notice to a putative class is inappropriate "unless they have demonstrated that they, themselves, have a viable FLSA claim, that the alleged illegal practices are companywide, and that, therefore, other workers are similarly situated with regard to the claims set forth in the complaint." *See White v. Baptist Mem'l Health Care Corp.*, No. 08-2478, 2011 WL 1883959, at *5 (W.D. Tenn. May 17, 2011.) ("[N]amed plaintiffs and opt-in plaintiffs must have viable FLSA claims to be deemed similarly situated and proceed collectively under Section 216.") (citation omitted); *Shell v. Pie Kingz, LLC*, 415 F. Supp. 3d 769, 772-773 (N.D. Ohio 2019). To meet this standard, Plaintiff "must demonstrate a factual nexus—that is, something more than 'bare allegations'" *O'Neal v. Emery Fed. Credit Union*, No. 1:13CV22, 2014 WL 6810689, at *5 (S.D. Ohio Dec. 3, 2014).

Plaintiff's Motion claims INOAC maintained a uniform policy of not compensating employees for work performed outside their scheduled shift start and stop times. Plaintiff's motion also alleges that employees performed compensable work during uncompensated time, including

8052019.1

changing into and out of PPE, receiving work instructions and/or assignments, attending meetings, walking to and from production areas, performing pre-shift work, and showering after their shift. (Motion p. 10-11.) Contrary to Plaintiff's conclusory assertions, he has not established the existence of a "**single, FLSA-violating policy**" as required by the Sixth Circuit.

 a. <u>INOAC's Rounding Practice Is Lawful</u>

The FLSA expressly permits employers to round employee punch-in and punch-out times when calculating hours worked. 29 C.F.R. § 785.48(b). Consistent with this regulation, INOAC implemented a neutral rounding practice under which non-exempt hourly employees' punch-in and punch-out times are automatically rounded to the nearest quarter-hour, regardless of whether the adjustment benefits the employee or the Company. For example, if an employee clocks in at 5:52, the time rounds down—in the employee's favor—to 5:45. (Hardymon Dep. 35–36.) Conversely, if an employee clocks in at 5:54, the time is rounded up to 6:00. (*Id*.) Plaintiff's time and payroll records confirm that rounding sometimes added time to his hours worked and sometimes reduced them and demonstrate that the allegation that he was only paid for work between scheduled shift start and end times – as opposed to the time he reported working by clocking in and out – is <u>false</u>. Plaintiff's testimony that "…whether I clock in at 5:45, 5:55, 5:40, I would get paid from 6:00 to 2pm for a straight eight" is demonstrably incorrect. (Pl. Motion at Page ID #425.) Because INOAC's payroll practice is lawful, neutral, and expressly permitted under the FLSA, it cannot support a finding that Plaintiff was subject to a FLSA violating policy, much less that he is similarly situated to others. (*See* Hardymon Decl. ¶17.)

 b. <u>Plaintiff Failed to Demonstrate a Common, Unlawful Policy Concerning PPE</u>

The FLSA does not require employers to pay for preliminary or postliminary activities, including donning and doffing, in every instance. Those activities are compensable only if they

9

8052019.1

are "integral and indispensable to the principal activities that an employee is employed to perform." *Integrity Staffing Solutions, Inc. v. Busk*, 135 S. Ct. 513 (2014); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29-30 (2005); 29 C.F.R. § 790.7(h); *Auxer v. Republic Waste Services of Ohio Hauling, LLC*, 2019 WL 1255551 (S.D. Ohio 2019) (granting motion to dismiss donning and doffing claims where plaintiff failed to identify activities meeting the *Integrity Staffing* standard). The integral and indispensable test is tied to the productive work that the employee is employed to perform, not to whether the activity is required by or benefits the employer. *Alvarez,* 546 U.S. at 36. However, even when an activity is integral and indispensable, the FLSA requires payment only if the employee must "***give up a substantial measure of his time***." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012) (quoting *Hill v. United States*, 751 F.2d 810, 814–15 (6th Cir. 1984)) (Emphasis added.). In other words, employers need not pay for *de minimis* work, such as "only a few seconds or minutes of work." *Id.* Although there is no rigid mathematical rule, "[m]ost courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable." *Arnold v. Schreiber Foods, Inc.,* 690 F. Supp. 2d 672, 685 (M.D. Tenn. 2010) (quoting *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir.1984)).

It is undisputed that the Company's requirement that safety glasses and ear plugs be worn on the production floor requires *de minimis* time. (Jones Decl. ¶6; Gibson ¶5; Pl. Dep. 71, 76; Hardymon Decl. ¶16.) Plaintiff admits that it takes about 30 seconds to place eye and hearing protection, which is clearly *de minimis*. As for the specific job-related PPE, the Company provides all required and optional PPE items in the production area, with the understanding that such PPE is donned after the employees are clocked in and have attended the pre-shift meeting where they received their work instructions. (Hardymon Dep. 46-47; 75; Hardymon Decl. ¶¶ 7, 8; Jones Decl. ¶13; Gibson Decl. ¶6.) Indeed, Plaintiff testified that he was clocked in when he got gloves, put on

10

a paint suit, protective sleeves and a respirator. (Pl. Dep. 46-47, 53, 196.) Even if gloves, paint suits, or other PPE are required for a specific job and are donned and doffed before an employee clocks in, Plaintiff presented no evidence that it takes 10 minutes or longer to put them on. The Company does not require employees to wear company-issued shirts or steel-toe shoes, but even assuming Plaintiff's claim were true, the Company does not require that they be kept and changed into or out of while onsite. (Hardymon Dep. 54; Pl. Dep. Exs. I at INOAC-184 and INOAC 189, H at INOAC 150, Ex G; Decl. Jones ¶17; Gibson Decl. ¶10; Hardymon Decl. ¶¶ 12, 13.) See *Auxer*, 2019 WL 1255551, at *2 ("[T]he [DOL] has maintained that even when employees don and doff employer-mandated gear at their workplace, such a wardrobe change is not compensable if employees have the option of dressing at home."). Because employees could wear these items from home, changing into or out of Company-issued shirts and/or steel toe boots is not compensable. Likewise, there is no Company policy requiring employees to use the showers. Hardymon Decl. ¶ 11; Jones Decl. ¶18; Gibson Decl. ¶11.) Accordingly, Plaintiff has failed to identify any common, unlawful policy under the FLSA that could support issuing court-authorized notice.

Further, Plaintiff has offered no evidence from which the Court could conclude that the type of PPE used, or the time associated with donning and doffing it, is similar for all production employees in every department. Plaintiff admits that job duties and associated PPE are different for production employees and paint line employees. (Pl. Dep. 86–87.) As established in the job safety analyses, the required PPE is anything but uniform across the class of employees to whom Plaintiff seeks to send notice and varies significantly from position to position. (Hardymon Decl. ¶9 and Exhibit A; Gibson Decl. ¶8; Jones Decl. ¶11.) See *Duncan-Watts v. Nestle USA, Inc.*, No. 1:19 CV 01437, 2020 WL 589041 (N.D. Ohio February 5, 2020) (denying conditional certification

11

where plaintiffs failed to show that donning and doffing was integral and indispensable to their principal activities and where Plaintiff failed to provide evidence that their positions were similar to those of other employees). The absence of evidence of a uniform policy requiring employees to spend more than *de minimis* time that is integral and indispensable to the job duties of all hourly manufacturing/production employes should result in denial of Plaintiff's motion.

> c. Plaintiff Has Not Demonstrated INOAC had an Unlawful Policy of Not Compensating All Hourly Manufacturing/Production Employees For Meetings

The Company's policy is that employees are to be clocked in and paid for all time spent attending meetings and INOAC produced documents demonstrating it instructed employees to clock in to attend meetings. (Hardymon Decl. ¶6.) Plaintiff has not identified a single specific meeting for which he was unpaid. He provided no details demonstrating dates, times, or durations of meetings he claims were unpaid. Indeed, he admits he was not paid for meetings only because he voluntarily chose not to clock in. (Pl. Dep. at 139-140.) Indeed, payroll and meeting records confirm that Plaintiff was paid for his attendance at meetings on April 19, July 19, and November 16, 2023. Records regarding other meetings held by the Company were for jobs Plaintiff did not hold or on days he did not work. (Hardymon Decl. ¶ 15 and Exhibits B and C.)

With no evidence of a common unlawful policy about compensation for time spent attending meetings and directly contradicted by the record, notice to a putative class is unwarranted. In sum, Plaintiff has failed to meet his burden of demonstrating any FLSA violation arising from a common policy applicable to all hourly production employees. He offers only his own unsubstantiated allegations, devoid of specifics, and identifies no established policy requiring uncompensated attendance at meetings. Such bare assertions are legally insufficient to support issuance of notice. *See Miner v. Newman Tech.*, Inc., No. 1:21-cv-00694, 2021 WL 3652277, at *6 (N.D. Ohio Aug. 18, 2021) ("conclusory statements are not sufficient evidence of a company-

wide policy of requiring employees to perform unpaid work"); *Rutledge v. Claypool Elec., Inc.,* No. 2:12-CV-159, 2012 WL 6593936, at *6 (S.D. Ohio Dec. 17, 2012) (collecting cases).

        d.   <u>Plaintiff Has Not Demonstrated Other Employees Are Similarly Situated.</u>

Finally, Plaintiff provides no evidence that he is personally aware that any other employee performed pre- or post-shift work without compensation. Instead, he relies on vague conversations with unidentified individuals at unspecified times. Although Plaintiff obtained contact information for all current and former employees in what Plaintiff characterizes as "extensive" discovery, not a single employee has come forward to support his allegations by way of affidavit, declaration or otherwise. For this additional reason, Plaintiff cannot establish he is similarly situated as required in *Clark*.

        **2.   Collective Action Treatment is Inappropriate Because Liability Must be Determined on an Individualized Basis.**

Because Plaintiff has not identified, and cannot identify, any policy or practice that violates the FLSA, there is no common evidence of liability or damages. Instead, Plaintiff and each opt-in would be required to prove their claims on an individualized basis. Each would have to show, among other things, that: (1) they performed compensable work off the clock; (2) INOAC was aware of such work; (3) any time spent donning or doffing of PPE or meetings or walking to their job assignment was more than *de minimis*; (4) such activity was "integral and indispensable" to their principal duties; and (5) they had no option to wear the PPE or shower at home.

Whether these activities constitute compensable activity under the FLSA requires a finding that they are "integral and indispensable" to an employee's principal job duties, an inquiry that necessarily depends on what those job duties are. Plaintiff's Motion disregards the substantial differences among production employees that would require the Court to undertake extensive, fact-intensive, individualized inquiries. The expansive putative class sought by Plaintiff includes all

production employees, comprising of approximately 54 distinct job descriptions with widely varying job descriptions, duties, and responsibilities, working in different departments under different supervisors. (Hardymon Decl. ¶3.) PPE requirements vary significantly and are worn at different times as needed, based on individual job duties. (Hardymon Decl. ¶ 9 and Exhibit A; Hardymon Depo. 53, 58; Gibson Decl. ¶8; Jones Decl. ¶11.) Employees could clock in from their phones – even before they entered the building – or at a time clock. The mere fact that Plaintiffs and the putative class members all worked in production/manufacturing is not sufficient to establish that they are "similarly situated."

Determining the number of compensable pre-shift or post-shift minutes potentially owed to each plaintiff is ill-suited for collective treatment because Plaintiff's allegations of FLSA violations are driven entirely by individual behavior, not Company policy. Determining compensable work time would require examining how an employee clocked in or out, and the activities each employee engages in before and after clocking in or out, inquiries that would vary widely across the broad class Plaintiff seeks to certify. PPE requirements, in particular, differ substantially from position to position, leaving nothing uniform about the proposed collective.

Courts regularly deny collective treatment where, as here, whether employees are "similarly situated" turns on highly individualized questions about job duties, PPE requirements, and daily routines, and where plaintiffs fail to present non-conclusory evidence that all putative class members performed similar duties or that donning and doffing was uniformly "integral and indispensable" to those duties. For example, in *Miner*, the court denied conditional certification of PPE claims because of the individualized nature of the analysis, holding: "Without making a merits determination or weighing credibility of the evidence, the Court finds that Plaintiff's claims and the claims of the other hourly employees requires an individualized analysis to determine whether

a particular FLSA violation took place." *Miner,* 2021 WL 3652277, at *6. Likewise, in *Pacheco*, a factually similar case, the court denied collective action where "the plaintiffs admittedly put on different items, at different times, in different places, all depending on their job duties and their own personal practices and preferences" and because the employer had "a formal policy to pay employees for donning and doffing activities, any failures to follow that policy will be unique to specific departments and supervisors." *Pacheco*, 671 F. Supp. 2d at 966. In *Duncan-Watts*, the court rejected a broad proposed class where the purported policy was unique to the named plaintiff's duties and the plaintiff failed to "describe what they do in the course of their employment with defendants." Similarly, in *Pippen*, the plaintiff alleged unpaid donning and doffing of PPE, but the court denied collective treatment because "neither Plaintiff nor the declarants describe their job duties or explain how donning and doffing protective equipment is integral and indispensable to their job duties." *Pippen v. Glob. Tech. Recruiters Inc.*, No. 1:21-CV-00311, 2021 WL 2430707, at *6 (N.D. Ohio June 15, 2021).

As in these cases, Plaintiff has presented no evidence from which the Court could determine whether putative class members are similarly situated or whether any allegedly required pre- and post-shift work was integral and indispensable to their duties. Plaintiff presented no evidence that any other employee was not compensated for alleged pre- and post-shift work, or that Plaintiff had knowledge of the same. Resolving these issues would require a series of individualized inquiries and individualized defenses, making collective treatment improper. "The very point of the "similarly situated" inquiry is to determine whether the merits of other employees' claims would be similar to the merits of the original plaintiff's claims so that collective litigation would yield efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Clark,* 68 F.4th at 1012 (quoting *Hoffmann-*

*La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). (internal citations omitted.) That similarity does not exist in this case and should lead to denial of Plaintiff's motion.

### 3. Plaintiff Is Not An Appropriate Class Representative

As noted above, the Company maintains FLSA-compliant policies. Any alleged departure from these policies would be a deviation unique to Plaintiff. For example:

- Plaintiff claims he donned job-specific PPE before receiving work assignments simply because he "wanted to be ready," despite no policy requiring it. (Pl. Dep. 90; 181-182; 186; 188-189.)

- Plaintiff admits some specific PPE he wore was based on his personal preference and convenience, not a requirement of the Company. (Pl. Dep. 151.)

- Plaintiff admits employees wore different PPE depending on job duties, and not all positions (even those on the paint line) require paint suits. (Pl. Dep. 50; 56; 187-188; 95)

- Plaintiff admits he took certain PPE to and from home despite no Company policy requiring him to do so. (Pl. Dep. 66; 69; 181; 184; 91.)

- Plaintiff chose to not clock in for all-staff meetings because he believed "it did not matter" and admits he is unaware if other employees did not clock in or were not paid for these meetings. (Pl. Dep. 139-140.)

- Plaintiff could not identify any other employee who worked off the clock. (Pl. Dep. 139–140.)

- Plaintiff admits he sometimes voluntarily assumed more duties than the job required. (Pl. Dep. 44.)

- Plaintiff admits that he donned job-specific PPE while clocked in. For example, he admits he was clocked in when he got gloves, put on a paint suit, protective sleeves, and a respirator. (Pl. Dep. 53, 46-47, 196.)

- Plaintiff could not recall any details about alleged showering requirements and claimed only required employees who got "really dirty," like employees in maintenance, to shower. (Pl. Dep. 198.)

- Plaintiff admits that there were instances he clocked in on his phone app even before entering the facility. (Pl. Dep. 62-63, 80.)

16

Because the action arises from circumstances that are purely personal, this action is inappropriate for collective action, and Plaintiff's motion should be denied. See, *Noble v. Serco, Inc.,* No. 3:08-76-DCR, 2009 WL 3154252, at *3 (E.D. Ky. Sept. 28, 2009) ("Several courts have held that, at the notice stage, '[a] court may deny a plaintiff's right to proceed collectively only if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice.'" (quoting *Murton v. Measurecomp, LLC*, No. 1:07CV3127, 2008 WL 5725631, at *4 (N.D. Ohio June 9, 2008)) (citing cases)); see also *Hambrick v. Promevo, LLC*, No. CV 19-17-DLB-CJS, 2020 WL 3621315, at *3 (E.D. Ky. July 2, 2020) (same). Plaintiff has failed to prove there is any generally applicable Company rule, policy or practice that violates FLSA. Plaintiff's claims are undoubtedly based on his individualized choices to deviate from Company policies or requirements. For this additional reason, Plaintiff's motion should be denied.

### IV. Equitable Tolling Must Be Denied Because Plaintiff Lacks Standing and Offers No Factual Basis to Support that Equitable Tolling is Appropriate

The Court should deny Plaintiff's request for equitable tolling for two reasons. First, Plaintiff lacks standing to seek equitable tolling on behalf of an unknown number of individuals who have not joined this action. Second, even if standing existed, Plaintiff fails to meet the established test for equitable tolling.

Plaintiff selectively quotes from Judge Bush's concurrence in *Clark* while ignoring the majority opinion, which did not alter Sixth Circuit precedent on equitable tolling before class certification. Notably, Judge Kethledge's majority opinion is silent on tolling, and the concurrences ***do not suggest*** that district courts ***must*** grant equitable tolling without applying the requisite test. See, e.g., *Clark* at 1015 (Bush, J., concurring) ("[i]t would therefore be appropriate for the district court on remand to consider the application of equitable tolling") (emphasis added);

17

*Adames v. Ruth's Hospitality Group*, No. 1:22-CV-00036, 2024 WL 1533171, at *8–9 (N.D. Ohio Apr. 9, 2024) (holding that concurring and dissenting opinions "lack authoritative weight").

As the Northern District of Ohio explained in *Adames,* quoting *Clark*, "all plaintiffs must affirmatively choose to become parties by opting into the collective action" and "any non-parties must present themselves to the court before the court has standing." *Adames*, at *9; *Clark*, 98 F.4th at 1009. Here, Plaintiff seeks tolling for "potential plaintiffs" who, by his own admission, are not yet parties to this case. (Motion p. 16.) In an FLSA action, "the named plaintiffs… do not represent anyone other than themselves." *Garcia v. RickeyO Constr.*, LLC, No. 2:23-cv-02426-atc, 2024 WL 1741349, at *4 (W.D. Tenn. March 13, 2024) (citing *Atkinson v. TeleTech Holdings, Inc.*, No. 3:14-CV-253, 2015 WL 853234, at *8 (S.D. Ohio Feb. 26, 2015). Plaintiff's request seeks to adjudicate rights of individuals outside the Court's jurisdiction, warranting denial for this reason alone. See *Adames*, at *9.

Even putting the issue of standing aside, Plaintiff's attempt to satisfy the *Andrews* factors fails. Courts have repeatedly held that applying the equitable tolling test prior to opt-ins joining is "inappropriate" because there is "little to no specific information" about potential plaintiffs. *Hogan v. Cleveland*, 690 F. Supp. 3d 759, 782 (S.D. Ohio Sept. 6, 2023) (citing *Richert v. LaBelle HomeHealth Care Serv., LLC*, No. 2:23-CV-437, 2017 WL 4349084, at *6 (S.D. Ohio Sept. 29, 2017) (collecting cases), and *Atkinson*, 2015 WL 853234, at *9); *see also Garcia*, 2024 WL 1741349, at *4. In his Motion, Plaintiff claims that names and contact information remain in Defendant's possession (Motion p. 17), but this lacks factual merit. Defendant provided the contact information for hundreds of potential putative class members to Plaintiff's counsel nearly six months ago. As noted above, despite this, no opt-in forms have been filed, and the Court has no factual basis to assess the *Andrews* factors for these individuals where Plaintiff had full opportunity

18

to develop evidence about potential opt-ins to support their request for equitable tolling, but failed to do so, there is a second, independent basis to deny equitable tolling.

V. **CONCLUSION**

For the above reasons, INOAC respectfully requests that the Court deny Plaintiff's Motion for Court-Authorized Notice. Plaintiff has failed to meet the burden of demonstrating that Blue is similarly situated to the putative collective or that a collective action is appropriate under the FLSA. In the alternative, should the Court determine that conditional certification is warranted, the scope of any notice should be narrowly tailored to include only those individuals who performed work subject to a policy that the Court finds that Plaintiff adequately asserted is an FLSA-violating policy. For example, that required use of specialized PPE – not just hearing and eye protection.

Respectfully submitted,

 EASTMAN & SMITH LTD.

/s/ Elizabeth L. Bolduc
Heidi N. Hartman (0074293)
Elizabeth L. Bolduc (0096901)
Jade L. Robinson (0100187)
One SeaGate, 27th Floor
P.O. Box 10032
Toledo, Ohio 43699-0032
Telephone: (419) 241-6000
Facsimile: (419) 247-1777
Email: HNHartman@eastmansmith.com
Email: ELBolduc@eastmansmith.com
Email: JLRobinson@eastmansmith.com

19

8052019.1

## PROOF OF SERVICE

    A copy of the foregoing was electronically served on August 15, 2025 upon Chastity L. Christy, chastity@lazzarolawfirm.com, and Anthony J. Lazzaro, anthony@lazzarolawfirm.com, of The Lazzaro Law Firm, LLC, attorneys for plaintiff.

                                               /s/ *Elizabeth Bolduc*
                                               Attorney for Defendant
                                               INOAC Exterior Systems, LLC